Copy hand-delivered
to chambers

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2011 NOV 18  P 1: 19

JON A. SANFILIPPO
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

          v.                            Case No. 09-CR-196

DERRICK AVERY, a/k/a "PIMP SNOOKY,"

                Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Melvin K. Washington and Joseph R. Wall, Assistant United States Attorneys, and the defendant, Derrick Avery, individually and by attorneys Donna J. Kuchler and Anthony D. Cotton, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in fourteen counts of a fourteen-count indictment, which alleges violations of Title 18, United States Code, Sections 371, 1591, 2421, 2423(a) & 2.

3.      The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to plead guilty to Counts One and Three as set forth in full as follows:

**COUNT ONE**
<u>(Conspiracy To Sex Traffic By Use of Force)</u>

The Conspiracy And Its Objective

1.        Beginning in or about January 2001, and continuing through on or about July 31, 2009, in the State and Eastern District of Wisconsin and elsewhere,

DERRICK AVERY,
a/k/a "PIMP SNOOKY,"

did knowingly and intentionally conspire with others known and unknown to the grand jury to recruit, entice, harbor, transport, provide, and obtain by any means, in and affecting interstate commerce, minor and adult females, knowing that force, fraud, and coercion would be used to cause the females to engage in commercial sex acts, in violation of Title 18, United States Code, § 1591.

Manner And Means Of The Conspiracy

It was part of the conspiracy that:

2.        AVERY and, at his direction, his most trusted prostitutes, recruited other women to perform acts of prostitution, or "dates," for money that would then be given to AVERY or to others for AVERY's benefit.

3.        AVERY directed his most trusted prostitutes to train new prostituted females in his business so they understood his "rules" of prostitution. This training, also known by his prostituted females as "programming," included the following rules, among others:

a)        while in the presence of other men, to always walk behind AVERY with their heads bowed;

2

b)      to never talk to another man who is involved in the prostitution business;

c)      to never look another man in the eye unless it is a man for whom the prostituted female is to provide sexual services for money;

d)      to never talk back to AVERY or talk disrespectfully to him while in the presence of others, including his other prostituted females;

e)      to have no boyfriends except for AVERY;

f)      to always use a condom during a prostitution "date";

g)      to not take off their clothes until the "date" was naked;

h)      to never use alcohol or drugs before a night of prostituting;

i)      to always give to AVERY, and to never retain for themselves, all of their earnings from prostitution or prostitution-related theft; and

j)      to call him "Daddy."

4.      AVERY directed his most trusted prostitutes to "debrief" prospective new prostitutes to learn about their backgrounds and the extent of their sexual experience.

5.      AVERY physically assaulted his prostituted females for various purposes including, among others:

a)      to make them work harder to provide him more money from their prostitution activities;

b)      to punish them for violating his "rules" of prostitution;

c)      to instill discipline in them and in the other prostitutes who observed the assaults;

3

d)  to prevent them from leaving his sex trafficking business;

e)  to create a constant atmosphere of fear such that they always did exactly what he told them to do.

6.  AVERY himself questioned prospective prostitutes about their personal lives and through this questioning determined the identities and addresses of their family members, so as to use this information to threaten and instill fear in them of: (a) the consequences of not earning him enough money through prostitution, (b) leaving his sex trafficking business, and (c) telling law enforcement about his illegal activities.

7.  AVERY pressured his prostituted females to earn a certain amount of money, or a "quota," each night or each week.

8.  AVERY prevented certain of his prostituted females from visiting or having contact with their families.

9.  AVERY himself, or through a trusted prostituted female, instructed his new prostituted females on how to determine if a prospective "date" was actually an undercover law enforcement officer.

10.  AVERY instructed his prostituted females to wire the proceeds of their prostitution activities to Milwaukee, Wisconsin, through Western Union.

11.  AVERY prevented his prostituted females from obtaining medical care for their injuries after he physically assaulted them.

12.  AVERY arranged for bail to secure the release of his prostituted females after they were arrested and held in jail.

4

13.     AVERY instructed his prostituted females to steal belongings from their prostitution "dates," such as cash, jewelry, credit cards, and other valuables.

14.     AVERY instructed his prostituted females to never mention his name if they were arrested.

15.     AVERY, in order to secure, maintain, and reinforce their loyalty, impregnated many of his prostituted females.

16.     AVERY physically assaulted his prostituted females in an assortment of ways, including but not limited to the following: beating them with his fists, wooden and metal brooms, pool cues, pans, chairs, and leather belts; slapping them in the face methodically back and forth using his open hands with his rings facing inward; "stomping" and kicking them with his alligator shoes; placing a phone book on their backs and striking it with a baseball bat; subjecting them to the "hot" treatment – that is, pouring rubbing alcohol on their bodies and lighting it; subjecting them to the "cold" treatment – that is, holding them down in a bathtub filled with ice cubes for a certain period of time.

17.     AVERY repeatedly warned his prostituted females that if they ever told law enforcement authorities about his sex trafficking activities, he would kill them or kill, or otherwise harm, members of their family.

Acts In Furtherance Of The Conspiracy

In furtherance of the conspiracy, AVERY committed and caused to be committed various acts within the Eastern District of Wisconsin and elsewhere, including but not limited to the following:

18.     In early 2001, AVERY transported or caused to be transported prostituted female # 1 from Milwaukee, Wisconsin, to Chicago, Illinois, for the purpose of prostitution.

5

19.     In early 2001, AVERY sent prostituted female # 3 to Miami, Florida, for the purpose of earning money through prostitution.

20.     In early 2001, AVERY sent prostituted females # 1 and # 3 to Miami together for the purpose of earning money for him through prostitution.

21.     On or about November 22, 2001, AVERY transported or caused to be transported prostituted female # 1 from Milwaukee to Chicago for the purpose of prostitution.

22.     On or about April 11, 2002, AVERY transported or caused to be transported prostituted female # 1 from Milwaukee to Chicago for the purpose of prostitution.

23.     In approximately June 2002, AVERY transported or caused to be transported prostituted females # 3 and # 4 from Milwaukee to Chicago for the purposes of prostitution.

24.     In approximately September 2002, AVERY punched prostituted female # 4 in the face because she had not made enough money in Chicago the night before.

25.     In October 2002, AVERY drove prostituted females # 3 and # 4 from Milwaukee to New Orleans, Louisiana, for the purposes of prostitution.

26.     In November 2002, AVERY drove to Detroit, Michigan, in an effort to find prostituted females # 3 and # 4 after they left his prostitution business.

27.     In November 2002, AVERY threatened to kill prostituted female # 3.

28.     On or about July 4, 2003, AVERY transported or caused to be transported prostituted female # 1 from Milwaukee to Chicago for the purpose of prostitution.

29.     On or about December 10, 2003, on behalf of AVERY, prostituted female # 6 agreed to perform a sex act for money at the Aladdin Casino in Las Vegas, Nevada.

6

30.     On or about December 11, 2003, on behalf of AVERY, prostituted child A offered to perform a sex act for money in Las Vegas.

31.     On or about January 17, 2004, AVERY threatened to kill prostituted female # 5 because she had left his prostitution business in Las Vegas.

32.     On or about March 4, 2004, on behalf of AVERY, in Las Vegas, prostituted female # 5 offered to perform a sex act on a man in return for money.

33.     On or about March 4, 2004, on behalf of AVERY, prostituted female # 1 propositioned a man for sex at the MGM casino in Las Vegas.

34.     On or about April 1, 2004, on behalf of AVERY, prostituted female # 2 propositioned a man for sex at the Rio Hotel in Las Vegas.

35.     In June 2004, AVERY had a discussion with prostituted child B in which he encouraged her to work for him as a prostitute.

36.     Between June and July 2004, AVERY took away from, and kept, prostituted child B's identification card, Social Security card, address book, and purse.

37.     On or about June 24, 2004, AVERY transported or caused the transportation of prostituted female # 7 from Milwaukee to Chicago for the purpose of prostitution.

38.     On or about June 29, 2004, AVERY transported or caused the transportation of prostituted child B from Milwaukee to Chicago for the purpose of prostitution.

39.     On or about July 23, 2004, AVERY transported or caused the transportation of prostituted child B from Milwaukee to Chicago for the purpose of prostitution.

7

40.     In or around July 2004, AVERY took nude photos of prostituted child B and prostituted female # 7 together at a public park in Milwaukee for the purpose of posting the photos with an escort service in Chicago.

41.     On or about August 6, 2004, AVERY beat prostituted child B with a wooden broom, a metal broom, and his hands in order to prevent her from leaving his sex trafficking business.

42.     In August or September 2004, AVERY transported several women to Las Vegas for them to engage in prostitution activities for his financial benefit.

43.     Between January and March 2005, to induce her to come to Las Vegas with him, AVERY told prostituted female # 8 that he worked for an entertainment company and could help her get employment in music videos.

44.     On or about March 25, 2005, on behalf of AVERY, in Las Vegas, prostituted female # 8 offered to perform a sex act on a man in return for money.

45.     On or about June 30, 2006, on behalf of AVERY, in Las Vegas, prostituted female # 6 offered to perform a sex act on a man for money.

46.     On or about February 19, 2007, on behalf of AVERY, at the Wynn Casino in Las Vegas, prostituted female # 9 told a potential client that he would have to pay her for sex.

47.     In approximately August 2007, at Marjani's nightclub in Milwaukee, AVERY beat prostituted female # 7 with a bar stool because he found out she had a boyfriend.

48.     In September or October 2007, as part of his recruitment of her, AVERY promised prostituted female # 10 that he would pay off all her debts, including her credit card balances and car loan.

8

49.     Between October 2007 and January 2009, AVERY repeatedly told prostituted female # 10 that if she left him or told law enforcement about his sex trafficking activities he would harm her mother.

50.     On or about October 29, 2007, on behalf of AVERY, at the Palms Hotel and Casino in Las Vegas, prostituted female # 9 stole approximately $15,200 cash and a watch valued at approximately $16,000 from an individual at the hotel.

51.     In early June 2008, in Milwaukee, prostituted female # 10 had sex with a man as payment for his professional services to AVERY.

52.     On or about August 13, 2008, on behalf of AVERY, at the Venetian Hotel in Las Vegas, prostituted females # 9 and # 10 stole approximately $2,200 from a prostitution client.

53.     In approximately November 2008, AVERY told prostituted female # 1 to fly from Minneapolis, Minnesota, to Las Vegas so as to resume her prostitution activities for him.

54.     In late April 2009, in Las Vegas, AVERY locked prostituted child A in a closet and discussed with others whether he should kill prostituted child A after finding out she made a statement to law enforcement authorities about his sex trafficking activities.

55.     In May 2009, AVERY told prostituted female # 8 to either lie to the grand jury investigating him or to take the 5th Amendment, and thereafter sent her $1,000.

56.     On or about May 13, 2009, AVERY videotaped prostituted females # 6 and # 9 at a hotel in Milwaukee regarding their grand jury appearances.

All in violation of Title 18 United States Code, Section 371.

9

**COUNT THREE**
(Sex Trafficking of a Child By Use of Force, Fraud, and Coercion)

THE GRAND JURY FURTHER CHARGES:

From in or about June 2004, through on or about August 8, 2004, in the State and

Eastern District of Wisconsin and elsewhere,

DERRICK AVERY,
a/k/a "PIMP SNOOKY,"

in and affecting interstate commerce, did knowingly recruit, entice, harbor, transport, provide,

and obtain by any means, prostituted child B, knowing that prostituted child B had not attained

the age of 18 years and would be caused to engage in a commercial sex act, and knowing that

force, fraud, and coercion would be used to cause prostituted child B to engage in a commercial

sex act.

All in violation of Title 18, United States Code, Sections 1591 and 2.

5.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of

the offenses described in paragraph 4.  The parties acknowledge and understand that if this case

were to proceed to trial, the government would be able to prove the following facts beyond a

reasonable doubt.  The defendant admits that these facts are true and correct and establish his

guilt beyond a reasonable doubt:

### *Count One*

*Beginning in or about January 2001, and continuing through on or about July 31, 2009,
in the State and Eastern District of Wisconsin and elsewhere, DERRICK AVERY, did knowingly
and intentionally conspire with others known and unknown to the grand jury to recruit, entice,
harbor, transport, provide, and obtain by any means, in and affecting interstate commerce,*

10

minor and adult females, knowing that force, fraud, and coercion would be used to cause the females to engage in commercial sex acts.

It was part of the conspiracy that:

AVERY and, at his direction, his most trusted prostitutes, recruited other women to perform acts of prostitution, or "dates," for money that would then be given to AVERY or to others for AVERY's benefit.

AVERY directed his most trusted prostitutes to train new prostituted females in his business so they understood his "rules" of prostitution. This training, also known by his prostituted females as "programming," included the following rules, among others:

a)      while in the presence of other men, to always walk behind AVERY with their heads bowed;

b)      to never talk to another man who is involved in the prostitution business;

c)      to never look another man in the eye unless it is a man for whom the prostituted female is to provide sexual services for money;

d)      to never talk back to AVERY or talk disrespectfully to him while in the presence of others, including his other prostituted females;

e)      to have no boyfriends except for AVERY;

f)      to always use a condom during a prostitution "date";

g)      to not take off their clothes until the "date" was naked;

h)      to never use alcohol or drugs before a night of prostituting;

i)      to always give to AVERY, and to never retain for themselves, all of their earnings from prostitution or prostitution-related theft; and

j)      to call him "Daddy."

AVERY directed his most trusted prostitutes to "debrief" prospective new prostitutes to learn about their backgrounds and the extent of their sexual experience.

AVERY physically assaulted his prostituted females for various purposes including, among others:

a)      to make them work harder to provide him more money from their prostitution activities;

11

b)    to punish them for violating his "rules" of prostitution;

c)    to instill discipline in them and in the other prostitutes who observed the assaults;

d)    to prevent them from leaving his sex trafficking business;

e)    to create a constant atmosphere of fear such that they always did exactly what he told them to do.

AVERY himself questioned prospective prostitutes about their personal lives and through this questioning determined the identities and addresses of their family members, so as to use this information to threaten and instill fear in them of: (a) the consequences of not earning him enough money through prostitution, (b) leaving his sex trafficking business, and (c) telling law enforcement about his illegal activities.

AVERY pressured his prostituted females to earn a certain amount of money, or a "quota," each night or each week.

AVERY ensured that each new prostituted female knew how to determine if a prospective "date" was actually an undercover law enforcement officer.

AVERY instructed his prostituted females to wire the proceeds of their prostitution activities to Milwaukee, Wisconsin, through Western Union.

On occasion, AVERY prevented his prostituted females from obtaining medical care for their injuries after he physically assaulted them.

AVERY arranged for bail to secure the release of his prostituted females after they were arrested and held in jail.

AVERY instructed his prostituted females to steal belongings from their prostitution "dates," such as cash, jewelry, credit cards, and other valuables.

AVERY instructed his prostituted females to never mention his name if they were arrested.

AVERY physically assaulted his prostituted females in an assortment of ways, including but not limited to the following: beating them with his fists, wooden and metal brooms, pool cues, pans, chairs, and leather belts; slapping them in the face; "stomping" and kicking them with his alligator shoes; on one occasion placing a phone book on their backs and striking it with a baseball bat; subjecting them to the "hot" treatment – that is, pouring rubbing alcohol on

12

their bodies and lighting it; subjecting them to the "cold" treatment – that is, requiring them to lie down in a bathtub filled with ice cubes for a certain period of time.

AVERY repeatedly warned his prostituted females that if they ever told law enforcement authorities about his sex trafficking activities, he would kill them or kill, or otherwise harm, members of their family.

In furtherance of the conspiracy, AVERY committed and caused to be committed various acts within the Eastern District of Wisconsin and elsewhere, including but not limited to the following (the defendant is aware of the names of the females identified below as "prostituted"):

In early 2001, AVERY transported or caused to be transported prostituted female # 1 from Milwaukee, Wisconsin, to Chicago, Illinois, for the purpose of prostitution.

In early 2001, AVERY sent prostituted female # 3 to Miami, Florida, for the purpose of earning money through prostitution.

In early 2001, AVERY sent prostituted females # 1 and # 3 to Miami together for the purpose of earning money for him through prostitution.

On or about November 22, 2001, AVERY transported or caused to be transported prostituted female # 1 from Milwaukee to Chicago for the purpose of prostitution.

On or about April 11, 2002, AVERY transported or caused to be transported prostituted female # 1 from Milwaukee to Chicago for the purpose of prostitution.

In approximately June 2002, AVERY transported or caused to be transported prostituted females # 3 and # 4 from Milwaukee to Chicago for the purposes of prostitution.

In approximately September 2002, AVERY punched prostituted female # 4 in the face because she had not made enough money in Chicago the night before.

In October 2002, AVERY drove prostituted females # 3 and # 4 from Milwaukee to New Orleans, Louisiana, for the purposes of prostitution.

In November 2002, AVERY drove to Detroit, Michigan, in an effort to find prostituted females # 3 and # 4 after they left his prostitution business.

On or about July 4, 2003, AVERY transported or caused to be transported prostituted female # 1 from Milwaukee to Chicago for the purpose of prostitution.

13

On or about December 10, 2003, on behalf of AVERY, prostituted female # 6 agreed to perform a sex act for money at the Aladdin Casino in Las Vegas, Nevada.

On or about June 24, 2004, AVERY transported or caused the transportation of prostituted female # 7 from Milwaukee to Chicago for the purpose of prostitution.

On or about June 29, 2004, AVERY transported or caused the transportation of prostituted child B from Milwaukee to Chicago for the purpose of prostitution.

On or about July 23, 2004, AVERY transported or caused the transportation of prostituted child B from Milwaukee to Chicago for the purpose of prostitution.

In or around July 2004, AVERY took nude photos of prostituted child B and prostituted female # 7 together at a public park in Milwaukee for the purpose of posting the photos with an escort service in Chicago.

On or about August 6, 2004, AVERY beat prostituted child B with a wooden broom, a metal broom, and his hands in order to prevent her from leaving his sex trafficking business.

In August or September 2004, AVERY transported several women to Las Vegas for them to engage in prostitution activities for his financial benefit.

Between January and March 2005, to induce her to come to Las Vegas with him, AVERY told prostituted female # 8 that he worked for an entertainment company and could help her get employment in music videos.

On or about March 25, 2005, on behalf of AVERY, in Las Vegas, prostituted female # 8 offered to perform a sex act on a man in return for money.

On or about June 30, 2006, on behalf of AVERY, in Las Vegas, prostituted female # 6 offered to perform a sex act on a man for money.

On or about February 19, 2007, on behalf of AVERY, at the Wynn Casino in Las Vegas, prostituted female # 9 told a potential client that he would have to pay her for sex.

In approximately August 2007, at Marjani's nightclub in Milwaukee, AVERY beat prostituted female # 7 with a bar stool because he found out she had a boyfriend.

In September or October 2007, as part of his recruitment of her, AVERY promised prostituted female # 10 that he would pay off all her debts, including her credit card balances and car loan.

14

Between October 2007 and January 2009, AVERY repeatedly told prostituted female # 10 that if she left him or told law enforcement about his sex trafficking activities he would harm her mother.

On or about October 29, 2007, on behalf of AVERY, at the Palms Hotel and Casino in Las Vegas, prostituted female # 9 stole approximately $15,200 cash and a watch valued at approximately $16,000 from an individual at the hotel.

In early June 2008, in Milwaukee, prostituted female # 10 had sex with a man as payment for his professional services to AVERY.

On or about August 13, 2008, on behalf of AVERY, at the Venetian Hotel in Las Vegas, prostituted females # 9 and # 10 stole approximately $2,200 from a prostitution client.

In approximately November 2008, AVERY told prostituted female # 1 to fly from Minneapolis, Minnesota, to Las Vegas so as to resume her prostitution activities for him.

### *Count Three*

AVERY found MS, "Prostituted Child B" at the Milwaukee Greyhound station in late June 2004 and convinced her to become his prostitute. She was a chronic run-away but had not prostituted before. From June 2004 until August 8, 2004, she worked as Avery's prostitute in Chicago nearly every night of her time with AVERY. Either he drove her with Shamika EVANS and another of his prostitutes or the three of them took the bus there.

In early August 2004, AVERY decided to move his stable of women to Las Vegas, Nevada. MS objected because she did not want to be so far away from her family. In an effort to force her to go with him to Las Vegas to prostitute, AVERY physically beat MS. MS was able to leave the house after Avery fell asleep and get help from a stranger at a gas station. She eventually went to her mother's house and the mother called police. She gave the police a detailed statement about her activities with AVERY and the beating. The police took photographs of MS that show the bruises and cuts she incurred from Avery's beating.

MS stated that AVERY knew that she was under age 18 when she started prostituting for him. Avery admits that he knew that she was 16 or 17-years old when he recruited her and that he knew when he recruited her that at some point during the time she prostituted for him, he would use force, fraud, or coercion against her in connection with her work as a prostitute.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

15

## PENALTIES

6.      The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fine:

Count One: 5 years imprisonment and a fine of $250,000.

Count Three: 40 years imprisonment and a fine of $1,000,000.

Both counts also carry a mandatory special assessment of $100.00.  Count One carries a maximum of three years of supervised release and Count Three carries a maximum of five years of supervised release.

7.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS

8.      The government agrees to move to dismiss the remaining counts of the indictment at the time of sentencing.

## ELEMENTS

9.      The parties understand and agree that in order to sustain the following charges the government must prove each of the following propositions beyond a reasonable doubt:

### COUNT ONE
### (Conspiracy To Sex Traffic in Children)

First,       That the conspiracy charged in Count One existed;

Second,      That the defendant knowingly became a member of the conspiracy with the intention to further the conspiracy; and

Third,       That an over act was committed by at least one conspirator in furtherance of the conspiracy.

Case 2:09-cr-00196-LA   Filed 11/18/11   Page 16 of 28   Document 162

**COUNT THREE**
(Sex Trafficking of a Child By Use of Force, Fraud, and Coercion)

First,        That the defendant knowingly recruited, enticed, harbored, transported or
              obtained a person whom the Defendant knew would be caused to engage
              in a commercial sex act;

Second,       That the defendant knew that the person was under 18 years of age;

Third,        That the defendant knew that force, fraud, or coercion would be used to
              cause the person to engage in a commercial sex act; and

Fourth        That the offense was in or affecting interstate commerce.

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorneys in turn have discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history.  The parties further acknowledge and understand that, at the time the defendant enters a guilty plea,

17

the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## SENTENCING GUIDELINE CALCULATIONS

14. The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

### Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

### Base Offense Level

16. The parties agree that the applicable base offense level for the offense charged in Counts One and Three is **34** under Sentencing Guidelines § 2G1.3(a)(1) and § 2X1.1.

18

## Specific Offense Characteristics

17.     The parties understand that the government will recommend to the sentencing court that a two-level increase for "undue influence of a minor" under § 2G1.3(b)(2)(B) of the Sentencing Guidelines and a two-level increase for "the commission of a sex act" under § 2G1.3(b)(4) of the Sentencing Guidelines is applicable to the offense level for the offenses charged in Counts One and Three.  The defendant is free to oppose those enhancements.  The government agrees that no other "Specific Offense Characteristics" under § 2G1.3(b) apply.

## Role in the Offense

18.     The parties understand that the government will recommend to the sentencing court that a two-level increase for "Aggravating Role" under § 3B1.1(c) of the Sentencing Guidelines.   The defendant is free to oppose that enhancement.

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. The defendant acknowledges, understands, and agrees that conduct consistent with the acceptance of responsibility includes but is not limited to the defendant not contacting potential witnesses in this case.  In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## SENTENCING RECOMMENDATIONS

20.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the amount of restitution and the terms and condition of its payment; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

22.     The parties understand and agree that the defendant will be pleading guilty to a pending charge of attempted pandering in Las Vegas, Nevada.  It is the understanding of the parties that the sentencing court in Las Vegas will impose a concurrent prison sentence for the defendant not to exceed the sentence imposed in the present case.  In the event that the sentence from the court in Las Vegas exceeds or is run consecutive to that in the present case, the parties agree that this would be grounds for the defendant to withdraw his guilty plea in the present case and that the guilty plea could not be used against him in any further proceedings in this case.

23.     Based on all the facts and circumstances known to the government, the government agrees to recommend a sentence of 20 years incarceration for the defendant.  The government will file a sentencing memorandum in advance of sentencing explaining the reasons for its recommendation.  That filing may be made under seal.

## COURT'S DETERMINATIONS AT SENTENCING

24.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

25.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

26.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

27.     The defendant agrees that, during the period of any supervision (probation or supervised release) imposed by the court in this case, the defendant will provide the Financial Litigation Unit (FLU) of the United States Attorney's Office with completed financial forms which will be provided by FLU, and will provide any documentation required by those forms. The defendant will provide FLU with such completed financial forms with required

21

documentation within the first two months of supervision, at six month intervals thereafter during supervision, and within the last six months of scheduled supervision.

## Fine

28.     The defendant understands that the government will recommend to the sentencing court that no fine be imposed against the defendant.

## Special Assessment

29.     The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

## DEFENDANT'S COOPERATION

30.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

31.     In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain

22

rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d.    At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

32.    The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorneys have explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may

23

question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

33. The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

34. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## FURTHER CIVIL OR ADMINISTRATIVE ACTION

35. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorneys and understands that nothing contained in this agreement is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

24

## GENERAL MATTERS

36.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

37.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

38.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

39.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, contacts any potential witness, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all

25

charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41.    The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

26

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorneys have reviewed every part of this agreement with me and have advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorneys and I am satisfied that my attorneys have provided effective assistance of counsel.


Date: _11-15-11_                          _____
                                          DERRICK AVERY
                                          Defendant


I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.



Date: _____                    _____
                                          DONNA J. KUCHLER
                                          Attorney for Defendant



Date: _11/18/11_                          _____
                                          ANTHONY D. COTTON
                                          Attorney for Defendant



27

For the United States of America:

Date: _11/18/11_

JAMES L. SANTELLE
United States Attorney

Date: _11/18/2011_

MELVIN K. WASHINGTON
Assistant United States Attorney

Date: _11-18-11_

JOSEPH R. WALL
Assistant United States Attorney

28