UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------

**UNITED STATES OF AMERICA,**

                                        Case No. 09-CR-196

                        Plaintiff,

                                        Milwaukee, Wisconsin

        vs.

                                        April 13, 2012

**DERRICK AVERY,**

                        Defendant.
----------------------------------------------------------------

### TRANSCRIPT OF SENTENCING

BEFORE THE **HONORABLE LYNN ADELMAN**
**UNITED STATES DISTRICT JUDGE**


**A P P E A R A N C E S**

For the Plaintiff:              United States Attorney
                                By: **Mr. Joseph Wall**
                                    **Mr. Melvin Washington**
                                Assistant U.S. Attorneys
                                530, U.S. Courthouse
                                517 E. Wisconsin Ave.
                                Milwaukee, WI    53202


For the Defendant:              Kuchler Law Offices
                                By:  **Mr. Anthony D. Cotton**
                                     **Ms. Donna Kuchler**
                                Attorneys at Law
                                1535 E. Racine Avenue
                                Waukesha, WI, 53187-0527


REPORTED BY:                    HEIDI J. TRAPP
                                Federal Official Court Reporter
                                310, U.S. Courthouse
                                517 East Wisconsin Avenue
                                Milwaukee, Wisconsin 53202
                                (414) 297-3074


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

## **TRANSCRIPT OF PROCEEDINGS**

1

2          THE COURT:  This is 09-CR-196, U.S. vs. Avery.  Can we

3    have the appearances?

4          MR. WALL:  Melvin Washington and Joseph Wall for the

5    United States.  Good afternoon, Your Honor.

6          MS. VODAK:  Good afternoon, Your Honor.  Eileen Vodak

7    with the Probation Office.

8          MR. COTTON:  Good afternoon, Judge.  Tony Cotton and

9    Donna Kuchler appearing with Derrick Avery.  He's here in

10   custody.

11         THE COURT:  Okay.  Before formally -- or going to the

12   formal sentencing, Mr. Avery, I got a request from you awhile

13   ago for a new lawyer.  It's my understanding that you and

14   Mr. Cotton have met and you've resolved your differences.  Is

15   that right?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Okay.  And so you're withdrawing your

18   request for a new counsel?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Okay.  And Mr. Cotton, you've been able to

21   resolve your problems?  You're happy to continue?

22         MR. COTTON:  Both Miss Kuchler and I are happy to

23   continue, Judge.

24         THE COURT:  Okay.  And -- let's see.  Mr. Avery, you

25   and your lawyer have gone over the presentence report?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And you've had enough time to meet with

3    your lawyer?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Okay.  And other than what's been filed in

6    writing, do you have any objections to the facts or the

7    guidelines that are in the report?

8          THE DEFENDANT:  No, Your Honor.

9          THE COURT:  Okay.  And the Government have any

10   objections to the facts or the guidelines?

11         MR. WALL:  No, Your Honor.

12         THE COURT:  Okay.  All right.  I'll momentarily get to

13   the objections.  Does either -- Mr. Cotton, or Mr. Wall, does

14   anybody want to add anything to what's been submitted in

15   connection with the objections?

16         MR. WALL:  No, Your Honor.

17         THE COURT:  I've gone over it.  But if you want to say

18   something more, I just --

19         MS. KUCHLER:  Yes, I would like to briefly address the

20   objections.

21         THE COURT:  Go ahead.

22         MS. KUCHLER:  Thank you, Your Honor.  The defense

23   believes that there should be, of course, a six point

24   subtraction from the recommended level calculated by the

25   Pretrial Services Department of Probation.  We believe that the

1  correct level should be 35.  I won't go through the factual

2  issues that we had.  Just simply that offense level computation.

3          And you've read, of course, the written submission.

4  But on the obstruction of justice, both Mr. Wall's office and us

5  both agree that Mr. Avery should not be given an enhancement for

6  obstruction of justice as a joint recommendation.  The reasons

7  are outlined in my -- or our presentence objections that we

8  submitted to the Court.

9          THE COURT:  Okay.

10          MS. KUCHLER:  We also do not believe Mr. Avery should

11  be given the two level increase for undue influence of a minor,

12  and for the commission of a sex act.  And if the Court agrees

13  with us on that, that would then eliminate the four points.  We

14  think that that is impermissible double counting, because the

15  underlying offense itself, the offense of conviction for

16  Mr. Avery, by necessity -- and I'm on page 4 of my objections.

17          THE COURT:  I don't recall -- let me get to that --

18  objection to the commission of the sex act part.  The rest of it

19  I'm with you, but I didn't -- I don't --

20          MS. KUCHLER:  It's the last paragraph of Page 4,

21  paragraphs 105 and 106.

22          THE COURT:  You're talking about Page 4 of your memo?

23          MS. KUCHLER:  Yes.  Of our PSR objections.  Under date

24  of April 5th.

25          THE COURT:  Okay.  Very good.  Go ahead.

1          MS. KUCHLER:  Okay.  So the last paragraph of that I

2     we had combined the undue influence of a minor objection, and

3     the commission of a sex act.

4          THE COURT:  Okay.

5          MS. KUCHLER:  And those were each a two point

6     enhancement.  We believe that that is impermissible double

7     counting, because a crime of conviction by necessity requires

8     the sex act and the involvement of a minor.  Even though we

9     recognize the case of Vizcarra, V-I-Z-C-A-R-R-A, at 668 Fed.3d

10    516, that indicates -- and that's a Seventh Circuit case -- that

11    recognizes that adjustments are permissible, it didn't -- it

12    doesn't mandate that the Court apply those enhancements.  And I

13    think -- as I said in my objections, that I think it's really

14    important that the Court -- as the guidelines notes indicate,

15    the Court supposedly -- is supposed to closely consider the

16    facts of this particular case in order to determine whether

17    Mr. Avery's influence over the minor compromised the minor's

18    behavior, or whether the minor was so inclined.

19          If the Court agrees with our objections, then the

20    correct offense level here would be 35, after acceptance of

21    responsibility.

22          THE COURT:  Okay.

23          MS. KUCHLER:  Thank you.

24          THE COURT:  Any response from the Government?

25          MR. WALL:  Your Honor, I -- like the Court, I also

1   missed the commission of a sex act aspect of the objection,

2   concentrating on the undue influence.  The Court has my

3   submission.  I can tell the Court that there are a number of

4   cases that I came across in looking for the undue influence

5   aspect of this that talk about the actual commission of a sex

6   act as not being double counting.  In other words, the

7   enhancement -- adding the enhancement is not double counting.

8          The Statute itself, the elements of the crime, do not

9   require that the person, child, or adult actually have committed

10  an act of prostitution.  The elements are set forth in my letter

11  to the Court on April 13th, so it's really the same argument

12  that I make under the undue influence.  That's all I can really

13  add.

14         THE COURT:  Okay.  All right.  First let me address

15  the factual objections and clarifications to the offense conduct

16  section of the PSR that the Defendant makes.  Paragraph 16

17  through 22 of the PSR are taken nearly verbatim from the Plea

18  Agreement that the Defendant signed.  Specifically from the

19  factual basis section, Section 5, which the Defendant agreed was

20  true and correct, and establishes guilt beyond a reasonable

21  doubt.  I can and will rely on these paragraphs and the other

22  ones to which he doesn't object.  I also note that a fair number

23  of the Defendant's factual objections, such as the denial that

24  Sierra traveled to other cities, and his denial that he was ever

25  violent with Sierra, are -- really they're bare denials.  And

1    bare denials are not sufficient to contest a presentence report.

2    The Seventh Circuit has long held that District Courts can rely

3    on information contained in a presentence report, as long as

4    it's well supported and appears reliable.  See, for example,

5    U.S. vs. Moreno-Padilla, 602 F.3d 802, at 808 and 809, Seventh

6    Circuit, 2010, citing U.S. vs. Heckel, 570 F.3d 791, at 795,

7    Seventh Circuit, 2009.  U.S. vs. Salinas, 365 F.3d 582, at 587,

8    Seventh Circuit, 2004.  U.S. vs. Mustread, 42 F.3d 1097, 1101

9    and 02, Seventh Circuit, 1994.

10           And when a Court relies on a presentence report, it's

11   the Defendant's task to show that the facts contained in the

12   report are inaccurate.  And to do that the Defendant has to

13   produce some evidence that calls the reliability or the

14   correctness of the facts that are in the report into question.

15   Just a bare denial is not enough.  See Mustread, 42 F.3d, at

16   1101 and 02.  Only if the Defendant's objection creates real

17   doubt as to the reliability of the information in the PSR does

18   the Government have the burden of independently demonstrating

19   the accuracy of the information.  See Moreno-Padilla, 602 F.3d

20   at 809.

21           Here the facts are generally taken from the sworn

22   statements of the women involved, and the statements corroborate

23   each other in significant ways, though all describe the same

24   general tactics that the Defendant used.  Tactics that he

25   himself admitted using generally in the Plea Agreement.  And so

1  Defendant's bare denials are insufficient.  Nevertheless,

2  because these factual objections don't affect the guidelines,

3  and because they won't affect the sentence, I don't have to

4  resolve them under Federal Rule of Criminal Procedure 32

5  (i)(3)(B).

6          The first guideline objection is to the enhancement

7  for obstruction under guideline 3C1.1, which the PSR bases on

8  Defendant's alleged attempts to influence witness testimony

9  before the Grand Jury.  The Defendant denies that he threatened,

10  intimidated, or otherwise unlawfully influenced a witness.  He

11  says he told them to tell the truth.  The Government agrees that

12  the Defendant should not receive this enhancement.  The

13  Government bears the burden of showing that the Defendant acted

14  with specific intent to obstruct justice.  See U.S. vs. House,

15  551 F.3d 694 at 699, Seventh Circuit, 2008.  And the Government

16  does not attempt to do so here.  So I will decline to impose

17  this enhancement.  And this makes the offense level 39.

18          The second guideline objection is to the enhancement

19  under guideline 3G1.3(b)(2)(B).  I read it as primarily based on

20  unduly influencing a minor, but it's also -- refers to the

21  commission of a sex act.  And it's basically a double counting

22  argument, and the argument essentially is that by enhancing for

23  unduly influencing and commission of a sex act, that it's a form

24  of double counting because this conduct is inherent in the

25  offense of conviction.  However, the Defendant doesn't argue

1    that the enhancement doesn't textually apply.  And as he

2    concedes, the Seventh Circuit has held that cumulative

3    adjustments and enhancements are permissible unless the

4    guidelines specifically say otherwise.  See U.S. vs. Vizcarra

5    V-I-Z-C-A-R-R-A, 668 F.3d 516 at 519, Seventh Circuit, 2012.

6            As the Government explains in its response set forth

7    in the addendum, there really isn't double counting here anyway,

8    as undue influence isn't required for the offense of conviction

9    itself.  And the facts as set forth in the addendum establish

10   that the enhancement applies.  First, given the age difference

11   between the Defendant and the victim, Mary, there's a rebuttable

12   presumption that applies under application note 3(b).  She was

13   17, and the Defendant was in his 30's.  Second, the conduct here

14   reflects the sort of psychological manipulation and enticement

15   employed by pimps on minors.  And this is discussed in

16   Paragraph 63 of the presentence, to which the Defendant doesn't

17   object.  Aside from denying that he took her purse or I.D. card.

18   And third, the cases reject this double counting argument.  See

19   U.S. vs. Lay, L-A-Y, 583 F.3d 436 at 446 and 47, Sixth Circuit,

20   2009.  So as to the sort of combined objection based on undue

21   influence of a minor, and commission of a sex act, I'm going to

22   overrule that objection.

23            Finally, Defendant objects to the scoring of the

24   battery conviction in Paragraph 153, arguing that this is an

25   outdated municipal violation; however, as he concedes, this

1  conviction falls within the 10 year lookback of guideline

2  4A1.2(e)(2).  And because battery is also a violation of State

3  law, it does count under guideline 4A1.2(c)(2).  In any event,

4  even if I exclude this point, the Defendant still falls in

5  history Category 6.  I can consider this matter under 3553(a),

6  but as a guideline objection it fails.

7          Otherwise, I'll adopt the facts in the PSR as my

8  findings of fact.  The guidelines then are a level 39, criminal

9  history 6.  The range then is 360 months to life imprisonment.

10  One to three years supervised release on Count 1; 2 to 5 years

11  on Count 3; 25,000 to a million fine; $200 assessment.  And if

12  we're -- if we can now proceed to sentence, Mr. Cotton or Miss

13  Kuchler, I'll be glad to hear from you and/or Mr. Avery.

14          MR. COTTON:  And we'll have some family members that

15  would like to say a few words at some point, too, Judge.

16          The Court obviously has received our sentencing

17  memorandum.  We're asking the Court to impose a decade in prison

18  in this case.  A decade is a huge amount of time.  What we're

19  asking the Court to do would in effect result in Mr. Avery being

20  incarcerated until his mid-50's.  And that's a substantial

21  sentence for anybody to have to endure.  It is not -- of course

22  the Court is obviously guided by the 3553(a) factors, and the

23  Court has to determine what's reasonable, given what Mr. Avery's

24  pled guilty to.  But I want to touch on a few remarks that

25  Mr. Wall made in his sentencing memorandum which was filed a

1  couple days ago, as well.

2         First of all, we don't think it's appropriate for the
3  Court to consider good time reductions when deciding how much of
4  a sentence Derrick is to serve.  We don't know whether he's
5  going to get a good time reduction.  We don't know whether it's
6  going to be applied to him.  There have been a number of threats
7  made against Derrick throughout his time in custody, given some
8  of the things he did 10 or 11 years ago.  We believe very
9  strongly that Mr. Avery's life is in danger when he goes to
10 prison.  We don't know who he's going to be surrounded by, who
11 his cellmates are going to be, or what type of people might have
12 contact with him.  And, of course, good time reductions are
13 contingent on a variety of calculations that the Bureau of
14 Prisons is going to have to make.

15        This is a case where Mr. Avery back in 1998 and 1999
16 did do some work with the F.B.I.  And that's been -- that's
17 become public as a result of motions that were filed in this
18 case.  Written decisions that were issued that were brought
19 by -- the motions were brought by prior counsel.  And in the
20 Government's sentencing recommendation and memorandum they focus
21 on, in particular, the 1998 conduct, and the 1999 conduct, and
22 point out that Mr. Avery was -- while he was on pretrial release
23 from his Federal case that he had filmed these two movies, and
24 that he had been on the Jerry Springer show.  And Your Honor has
25 a copy of the Jerry Springer show that was submitted in advance

1   by the Government as well. All of this behavior and action was

2   done in cooperation with the F.B.I. They knew that Mr. Avery

3   was doing it. And, in fact, even in the files that were

4   released by the Court when -- I think it was Judge Goodstein had

5   ruled on releasing these files -- even in those records it's

6   reflected that Mr. Avery was to enhance his image as a Snooky

7   character. And so he had -- to enhance that image, he had done

8   this Jerry Springer episode where he's coming out in this almost

9   comical outfit, and this comical jewelry that he's wearing.

10          He had done these movies that the Government mentions

11  in their sentencing memorandum. But none of this was foreign or

12  outside of the scope of what he was permitted to do, and even

13  being asked to do as part of his work. The F.B.I. wanted Mr.

14  Avery to portray this image as somebody who is a pimp Snooky, a

15  successful type person who can recruit drug dealers into the

16  fold, or recruit other people, so that the F.B.I. can make other

17  investigations.

18          I think people do age out of the criminal justice

19  system. And when we're talking about recidivism, one of the

20  factors for the Court to consider is whether the sentence that

21  Your Honor chooses to impose will sufficiently punish Mr. Avery

22  for his crimes, but also protect the public going forward.

23  People do age out of the criminal justice system. Mr. Wall has

24  taken the position that unlike drug dealing, or bank robbery, or

25  burglary, that a sex trafficker doesn't age out of his

1  profession.  There's no empirical basis for that.  In fact, the

2  Sentencing Commission itself recognizes that people do age out

3  of the criminal justice system.  And there's never been a

4  distinction that I've seen in any of the studies that suggest

5  that somebody in Mr. Avery's position would be differently

6  situated.

7  The sentence that the Government is asking for would

8  result in Mr. Avery spending the rest of his natural estimated

9  life in prison.  We don't think that he should get a life

10  sentence for what he did.  We think that a sentence of a decade

11  is so substantial that it will have the proper impact not only

12  specifically on Derrick, teaching him that what he did was

13  wrong, but also generally.

14  People have called this case a high profile case.  The

15  media has covered Mr. Avery's various Court appearances.  And so

16  we would be remiss if we didn't also consider general

17  deterrence.  But a decade is such a huge amount of time,

18  especially for somebody who's 45 years old, and looking at a

19  life expectancy of early 60's, that it does send that message to

20  the public that Courts don't take this behavior lightly.  People

21  are punished very harshly for actions they did.  And Mr. Avery

22  would be no different.

23  The 3553 factors I think are instructive.  And we've

24  tried to touch on many of them in our memorandum.  But Mr. Avery

25  grew up like a lot of people that this Court sees, without a

1    Dad.  He grew up in a neighborhood that was violent, poor,

2    dangerous.  Two of his brothers are serving significant prison

3    sentences because of violence that occurred within their

4    community.  There were gang members who on a daily basis would

5    threaten the Avery family.  And Derrick did what a lot of young

6    men do growing up in the shadows of their older brothers.  He

7    would be in physical altercations when people were threatening

8    their lives.  Gang violence, drugs, that sort of horrific

9    existence that many Defendants experience was something that was

10   a very real part of Derrick's life.  And I think, frankly, he

11   strikes me as the kind of person that if he hadn't been raised

12   in that environment, if his father had been a CEO of a

13   Corporation, it wouldn't surprise me if that's the path that Mr.

14   Avery would have pursued.

15           He does care about his family very deeply.

16   Notwithstanding his difficult upbringing, he is a loving father.

17   His children all -- including the ones who are nearing adult

18   age -- all say the same thing.  That he's somebody who has

19   supported them.  They do care about him very dearly.  And I

20   think significantly, Judge, he turned over his assets in this

21   case to the Child Support Division so that he could make some

22   effort towards the payment of the arrears on that.  And so even

23   while he's in custody he's taken the steps that he can take to

24   try to make good on those obligations to help his children.

25           His family is going to be without him for a huge

1  period of time, whatever the Court chooses to do.  Whether the

2  Court follows the Government's recommendation, or does something

3  different, or follows our recommendation.

4        The criminal history that Your Honor is looking at

5  is -- much of it is dated.  We're talking about offenses from

6  the 90's.  And by the nature of how the conspiracy has been

7  charged in this case, we have a lookback period that's about

8  twice as long as we would otherwise be looking back towards.

9        I think in terms of disparity, we have to think about

10  two important things.  One is disparity amongst other

11  Defendants.  And I would submit that this isn't -- this case

12  isn't the most horrific of cases that we could envision.  We are

13  talking about -- at least as the Court mentioned earlier, a

14  minor who was 17 years old, for example.  Certainly not an 11

15  year old, or somebody who was ripped from a home and forced into

16  an environment where they don't know the language, or don't know

17  the culture, or don't know the currency.  We have cases -- and

18  we've cited them in our sentencing memorandum -- where human

19  traffickers -- and I use that word sincerely -- human

20  traffickers would put people in box cars or on trains and ship

21  the people to an environment where they don't have any ties or

22  any connection.  They don't speak the language.  Cases where

23  women are confined to rooms, and the would be johns are brought

24  to the room to have sex with those minors and those children.

25        We don't have that type of behavior.  What we have in

1   this case is the vast majority of pre-existing prostitution.

2   Women who made decisions to be part of the Snooky clan,

3   so-to-speak.  Women who were enamored by the -- many of the

4   women in this case enamored by the sort of public image that had

5   been portrayed in these movies and the Jerry Springer episode.

6   And so they don't deserve blame, of course.  And Mr. Avery is

7   the one here who's being prosecuted and faces such a massive

8   prison sentence.  But I think those are the types of things that

9   distinguish his case from certainly much more serious cases that

10  have been prosecuted in this country, and that the Court could

11  envision.

12          And also we have issues of equity.  Shamika Evans, his

13  co-Defendant, hasn't been sentenced yet.  I don't know what

14  she'll get.  But I suspect that she'll be -- that there will be

15  a recommendation for a probationary disposition.  We have

16  Mr. Avery, who has spent three years in County Jails throughout

17  Southeastern Wisconsin, and we have Miss Evans who's been out of

18  custody during this time.  And I think it would be -- when we

19  talk disparities -- and we're talking, of course, disparities

20  amongst other cases that are much more serious that we've cited

21  in our memorandum -- but also disparities amongst a

22  co-Defendant, we're looking at the greatest disparity that there

23  could be.  Miss Evans being given a probationary resolution when

24  she played a very important and central role in what took place

25  here, versus Mr. Avery, who's looking at the rest of his life in

1  prison.  So I think that's an important consideration for Your

2  Honor to take into account.

3      I think that's another reason why a decade is

4  sufficient but not greater than necessary to address the 3553

5  factors to impress on Mr. Avery that the crime is serious.  That

6  sentence would be seven and-a-half times longer than any prison

7  sentence he's ever -- any confinement sentence he's ever served.

8  That sends a message to a person.  In fact, I would submit that

9  the three years that he spent in the County Jails have sent a

10 significant message.  He lost his Grandmother, as the Court is

11 aware, not too long ago.  And he was extremely close with her.

12      But we look out into the courtroom and Your Honor can

13 see also that there's a very strong family presence here.  He

14 does have people that love him, that care about him, that will

15 support him.  I think that Derrick has -- he has years left in

16 his life where he can do good, Judge.  He can make a difference

17 in this world.  He's already begun that process.  He can

18 certainly cooperate in the future.  We know that after any

19 sentence that's imposed, there will be a period of supervised

20 released.  So the community will continue to be protected when

21 Mr. Avery comes out of prison in those years.

22      So I think for all those reasons, Judge, a sentence of

23 10 years in prison would be sufficient.  I think that would

24 address all the criteria that the Court has to consider, and

25 would properly punish Mr. Avery for what he's done.  I would ask

1    that we have a few family members say a few words at this point,

2    Judge.

3              THE COURT:  Okay.

4              MR. COTTON:  Could we start with Regina Jordon?  Is

5    Regina Jordan's mother here?

6              THE DEFENDANT:  Yep.

7              THE COURT:  Speak into the mike.  And first state your

8    name and spell your last name.

9              MS. JORDAN:  Your Honor, my name is Carrie Jordan,

10   J-O-R-D-A-N.

11             THE COURT:  And Carrie, how do you spell Carrie?

12             MS. JORDAN:  C-A-R-R-I-E.

13             THE COURT:  Okay.  Go ahead.

14             MS. JORDAN:  Your Honor, I just gave you my name, but

15   I just wanted to tell you I've been knowing Mr. Avery most of

16   his life.  And when I think of him, and have thoughts about him,

17   I think of only good things, because he is a good person.  Don't

18   misunderstand me now, because I know we all make mistakes, and

19   we all, you know, make choices that we have to suffer the

20   consequences for.  And I'm not trying to say that he hasn't, or

21   wouldn't, or won't again.  But he has children out there that

22   loves him.  He has family out there that loves him.  He's a

23   person that does everything -- I've only known him to do good

24   for people.  Help people.  All people.  And when he was helping

25   these people, there wasn't any discrimination.  He helped black,

white, little children, old people, like myself.  In times that
I really needed it, he was there.  And he is really not my
grandson, but he seemed like my son to me when he was at home.
I never saw any bad about him.  And being a senior I've seen
much injustice in this system.  I've also seen some with him.
But the thing that's got Derrick I think here is greed,
prejudice, antisocial attitudes, and corruption.  The only
reason he's here today is because of some of these things.  And
because we love him, that's why we're here.

        I'm praying and asking you, Judge, to please be
lenient on Mr. Avery.  He served a certain amount of time.  He's
learned a lot.  The State, the system, has taught him a lot.  He
has learned a lot from the letters, and books, and different
things that we have sent him.  And he is a changed person.

        So I'm asking you, please -- I remember reading at
Jeremiah I think it was 10:23, it's not for a man to direct his
own steps.  So the system has helped him to start his steps in
the right direction.  I pray and ask that you please be lenient
and allow us now, with the help of God, to let him continue to
walk in the direction he should go.  Thank you so much.

        THE COURT:  Okay.  Thank you.

        MR. COTTON:  I'd ask that his oldest daughter, Melania
Avery make her statement.

        THE COURT:  Okay.

        MR. COTTON:  She had written out her statement, but

1   it's apparently on her phone, so she's going to have to look at

2   that when she speaks.

3           THE COURT:  State your name.

4           THE WITNESS:  Melania Avery.

5           THE COURT:  Okay.

6           MS. AVERY:  M-E-L-A-N-I-A.  Hello.  I'm Melania Marjan

7   (phonetic), Derrick's oldest daughter.  I didn't expect to

8   initially speak for this occasion.  I would have never thought I

9   would be having to speak for anything like this.  Yes, I'm

10  familiar with who Snooky is, but I'm more in tune with Derrick,

11  my father.

12          THE COURT:  Can you get the mike a little closer to

13  her?

14          MS. AVERY:  Yes, I'm familiar with who Snooky is, but

15  I'm more in tune with Derrick, my father.  I remember growing up

16  I always wanted to know who this man was that would draw me

17  mini-mouse pictures and send them in envelopes with long letters

18  attached.  As I got old older, I came to know about this

19  semi-father of mine.  The semi-absent father of mine.  My mother

20  expressed -- my mother expressed a melting pot of emotions when

21  I would ponder about him, and his whereabouts.  Continuously ask

22  questions that she didn't have the need -- that she didn't have

23  the want or need to answer, which led to us having a strained

24  relationship.  We both admit that she kept me away from him

25  because she felt that Snooky wasn't the man that she was in love

with and had a daughter with. For me it was an awkward
relationship between my Dad and I. Although he wasn't there as
much as I felt he should have been for me physically, he was
there for me mentally, spiritually, and emotionally to make up
for it. He instilled in me at an early age that I was royalty
and a child of God. He showed me the good and bad sides of life
in this cruel and evil world. (Indiscernible) He kept it real
with me in ways my mother never did. And I wanted her to, but
she didn't.

When I was molested he was my superman. He made me
feel I was still valuable and worth something. I think that's
why my Dad and I share such a close bond. Me being the oldest,
a product of himself and my mother, I'm a replica of both of
them. In so many ways him. I'm just like my Dad from the
skinniness of our frames, the shape of our nose, to our
demanding voices, headstrong attitudes, and our family oriented,
caring, vibrant personalities, even down to our razor sharp
tongues and short fused attitudes are the same.

My father is not a saint, nor am I to portray him as
one. The good outweighs the bad when it comes to him and his
family. Something some people don't know about, he tells us,
all his kids, no matter what we are Averys, meaning no one --
nothing can come in between. Our greatness is beyond other
human beings. He spoke things to me that no one has ever yet to
say. If it wasn't for the street life, he could have been a CEO

1   of any business.  And I mean any.  I don't think -- I think my

2   father is a genius, but he was taken by the streets.

3           I know the character Snooky, but that's not my father.

4   Derrick is the opposite to me.  To us.  His mother, his

5   children, his family.  He's not malicious, inconsiderate, or

6   this evil creature described.  I don't even read (indiscernible)

7   that has been published about him.

8           These events have brought an enormous dark cloud over

9   my life.  I found out I was pregnant the same week my father was

10  arrested.  It felt like everything was going good, and then just

11  turned sour.  My mother and I never saw things eye to eye.  And

12  only person that didn't judge me, always listened to me, and

13  gave me guidance and motivation was taken from me.  Here I was,

14  left to raise a baby, a boy at that.  The main man in my life

15  was gone, although I was blessed with the perfect one to follow.

16  Not having my father around to share these moments hurt more

17  than before.  (Indiscernible) yell and scream because no one

18  understands and he just listens.  I miss that.

19          (Indiscernible) to have him teach me how to potty

20  train my son.  Caleb irritates me because he's hard headed and

21  doesn't listen.  He'll never ever be able to keep his children

22  in close reach around each other, loving and caring for them,

23  showing and teaching them the rights and wrongs, good and bad

24  things like he taught me.  (Indiscernible).  I sit back and

25  think with my father being in this situation, not being around,

we have to rely on each other.  The kingdom of greatness, love
and prosperity that my father envisioned and attempted to
create.  But what God planned for him has now fallen on me.  I
question and wonder why am I given such a heavy burden?  But I
realize God doesn't put more on us than we can handle.  Every
day is a test.  My father taught me that when given a chance,
you have to make it your best.  And if you don't fall, you shall
succeed.

Daddy, when I look at you in your situation, like me
in my situation, I see history repeating itself.  Except I won't
let the streets corrupt me.  You taught me to be different.  Who
I'm supposed to be.  Not a product of my environment.  If only
we practice what we preached.  But we're adults.  And we correct
ourselves (indiscernible) wrong and accept the consequences and
reactions for our actions.  When given the chance, just make it
right.

I love you regardless of what's been said
(indiscernible).  I promise (indiscernible) family will stick
together.

THE COURT:  Thank you.

MS. JORDAN:  My name is Regina Jordan, R-E-G-I-N-A,
J-O-R-D-A-N.  Your Honor, Judge Adelman, I'm the oldest of all
the women in Derrick's life.  When I met him, to me he was a
cornball.  He likes putting cars together.  Things like that.
Messing with electricity.  Shining up automobiles until they

1   sparkle, and DJ'g.

2        I was an exotic dancer and did a lot of other things

3   in my past that I'm not proud of.  But today my kids' father --

4   and I say my kids, because I have my oldest son by Derrick

5   Avery, Senior.  And my daughter is 26 years old, Shakeba

6   (phonetic).  He took her, and adopted her, and said she was his

7   own.  And today you cannot tell her that he's not her father.

8        My kids' father is being sentenced today and punished

9   for human trafficking.  It's not fair to punish him for this,

10   when a lot of the women in his life were able to come and go as

11   they please.  They, like myself, chose a lifestyle that was not

12   the best.  They even sometimes got close to me and spent time

13   with me.  I've watched all their children, and I've baby-sit for

14   them.  So just like myself, they had the opportunity to change

15   their life, as I did, and do something better and positive.

16        If he should be punished for anything, it should be

17   domestic violence, tax fraud, or something of that nature.  He

18   didn't profit of his kids' Mom, because he took good care of

19   them, their Mom, as well as his 20-some kids.  Your Honor, I

20   went downtown on many occasions and paid child support for their

21   children.  (Indiscernible) profit from or purchased was his

22   daughter's and kids' moms.  That's what she wanted, and that's

23   what he gave her.

24        I kept in touch with several of his kids' Moms, who

25   were supposed to testify.  I gave you earlier a letter from them

1 stating that they love, they care, they miss him, and they want

2 him home soon. Your Honor, those kids' moms, just like myself,

3 we're not uneducated. We're women who didn't know better. If

4 they were victims, they were victims of being in love with a man

5 who was attracted to exotic dancers, sexy women, and women who

6 chose the nightlife for a living. Why should we all, including

7 my children and myself, be punished for that?

8         So please, Your Honor, when you sentence him please

9 keep in mind that when you sentence him, you sentence all of us.

10 That's all I am asking, is that he get fair treatment. His life

11 in his danger, as well as my son's life. And my son has been a

12 target of violence since this. He's doing a lot better. But I

13 know you have to do your job, and impose justice. We're not mad

14 at that. We just want him home soon. Thank you.

15         THE COURT: Okay. Thank you. Does your client want

16 to make a statement?

17         MS. KUCHLER: Yes, Your Honor.

18         THE DEFENDANT: Your Honor, a lot of people may not

19 believe anything that I say. And a lot of people may think it

20 don't come from my heart. But I'm sorry. I'm sorry to all my

21 kids' mothers. I'm sorry for everybody involved in this case.

22 We decide to get into a crime that we didn't look at was doing

23 no wrong. Because it was our own bodies. It was ourselves.

24 But it is wrong. I can't take back my actions or my conduct. I

25 can't rewind the time. I've tried to turn around with -- my

1  relationship with all my kids' mothers and tell them this won't

2  last long.  And one day I'm going to have to explain to the

3  world who is Pimp Snooky.  And the day has come.  My face has

4  been paraded on many box covers, on many videos, as Pimp Snooky.

5  But that's not who Derrick Avery is.  Pimp Snooky is a brand,

6  just like Pepsi or something.  It makes money.  But it wasn't to

7  make money off of the women that I like, the women I care for,

8  the women that I have kids with.  And not just one.  I have 3,

9  4, 5 kids that I miss.  I'm sorry.  I'm sorry.  I'm sorry for

10 the embarrassment that I've brought upon my mother, my auntee,

11 my kids' mothers' mothers, their Grandmothers, their auntees,

12 all the ladies.  I'm sorry.

13              THE COURT:  Okay.  Thank you.

14              MR. WALL:  Your Honor, there is a family member, Miss

15 Patricia Myers, who would like to address the Court.  She can

16 sit next to Mr. Washington here.

17              THE COURT:  Okay.

18              MS. MYERS:  Thank you, Your Honor.

19              THE COURT:  State your name and spell your last name.

20              MS. MYERS:  Patricia Myers, M-Y-E-R-S.

21              THE COURT:  Okay.

22              MS. MYERS:  Condolences to your family.

23              THE DEFENDANT:  Thank you.

24              MS. MYERS:  Well, I've listened to a lot.  And I did

25 send a letter to you.  I believe everyone has read it.  Thank

1   you.  And I was listening to Mr. Avery's family, and I realize

2   that it isn't just my family.

3          He says he learned a lot.  I think he already knew a

4   lot.  He must have been a very intelligent person to be able to

5   con all the young women into doing his bidding.  Leaving their

6   children.  Taking his abuse.  Taking them away from the families

7   that loved them.  Not allowing them to keep in touch.  I had to

8   hire a private detective.  My heart has been broken.  My

9   Grandmother used to say you can't die from a broken heart.  Oh,

10  yes, you can.  Or you wish you could.

11         And I'm watching a little girl that was dragged around

12  with them like a little animal, almost, who now is suffering.

13  Who didn't get to go to kindergarten, who didn't get to go to

14  first grade, who now is failing all her classes at 12 years old.

15  She was not allowed to do her number facts.

16         I'm not totally blaming that on Mr. Avery.  But let me

17  tell you, the girls were afraid.  And I was told don't say

18  anything mean to him.  He'll hurt you.  Now, I believe that with

19  all my heart, because he never hurt me, physically, but he

20  certainly broke my heart.

21         And why should he be rewarded for the heartbreak he's

22  brought to the girls' families?  To his family?  And he expects

23  to be rewarded for that?  I'm sorry.  The girl in question that

24  I'm talking about came home with everything she owned in a

25  garbage bag.  Everything he took from her that she had before,

1  including her pride, her human dignity, that was gone.  And she

2  has worked for the last five years to get out of that, and to

3  try to be a decent human being.  She's gone to school.  She

4  wants to be a civil rights attorney.  Guess what happened when

5  she went for her apprenticeship?  Her background check refused.

6  Anything she wants to do in law enforcement or in an attorney's

7  area in a courtroom like this.  Never, never, will she be able

8  to get a political position.

9        Everything -- she's had to reduce herself at this time

10  to food stamps.  Not that that's any crime.  Please don't

11  misunderstand me.  I'm not a snob.  I've been there, too.  I've

12  not grown up in an easy life.  But I can't forgive for the

13  things that he put me through.  Having to hire a Detective,

14  having to go to another State just before that house was raided.

15  Thank God, within 15 minutes, I got that little child out of

16  there.  Fifteen minutes before it was raided.  And you know what

17  I was told?  That's her stupid fault.

18        He doesn't keep any paper trails.  But the girls do.

19  And those paper trails will follow them as long as they live.  I

20  don't think, at 65, if that's when he's released, or whenever it

21  is, he will be any different than he is today.  That's all he

22  knows.  What else does he know, except to use, and con, and

23  cheat.  Thank you for giving me the opportunity to speak.

24        THE COURT:  Thank you.

25        MR. WALL:  Your Honor, thank you.  As to sentencing

1   comments, and the sentencing factors, pretty much all of my

2   comments already appear in the sentencing memorandum that we

3   filed with the Court on Wednesday.  Some of those facts do bear

4   repeating.

5        First of all, Mr. Avery is a pimp of national

6   significance, and international reputation.  He may have been

7   born and raised in Milwaukee, and may have used this city for

8   many years as his base of operations, but it's very clear that

9   he sent his prostitutes to cities throughout this country to

10  earn money for him in prostitution.  And this is a man very

11  proud of his national and international reputation as a pimp's

12  pimp.

13       On his left arm appears a tattoo in full color of a

14  naked, high heeled woman, lying on her back, holding a globe,

15  her legs spread wide open so as to show more clearly, to anyone

16  who looks at his tattoo, the cash flowing from her vagina, into

17  the open hands of another.  And that other is most certainly

18  Derrick Avery.

19       On his right arm is a second tattoo.  Also in full

20  color.  A tattoo of the globe, the world, with a diamond in the

21  middle of it.  Surrounded in capital letters with the words

22  "international pimp".  He is an international pimp.  And he

23  proudly advertises this.  He has never had any shame about what

24  he's done, and how he's earned his money.

25       Avery was crowned Pimp of the Year in the late 1990's

1   at the National Players Ball held here in Milwaukee at Serb Hall

2   on Oklahoma Avenue. We have a video of that celebration,

3   complete with the arrival of stretch limousines carrying pimps

4   from all over the country, along with their chief prostitutes,

5   bedecked in full pimp regalia, with jewelry covering their

6   hands, their fingers, their wrists, and dangling from their

7   necks. Real jewelry. Real money. And Avery was the king of

8   this celebration. And it ended with him being crowned and

9   receiving a giant trophy as the nation's pimp of the year. No

10   one at the F.B.I. attended this celebration or cast a vote

11   making Mr. Avery the Pimp of the Year at Serb Hall.

12         He and his prostitutes appear on the back DVD cover of

13   the 1999 Hughes Brothers movie American Pimp. A movie that

14   anybody can rent from Netflix or purchase from Amazon-dot-com,

15   among other retailers. Nobody at the F.B.I. encouraged his

16   participation in this movie, and I have seen no information that

17   the F.B.I. knew he was being filmed. He also appears in the

18   documentary Pimps Up, Ho's Down, yet another commercial video

19   documenting, and ignorantly and irresponsibly glamorizing the

20   pimping lifestyle. Again, nobody from the F.B.I. encouraged his

21   participation in this documentary. I have seen nothing in the

22   F.B.I. files that tells me they knew he was involved in this.

23         In July of 1999, while he was on Federal bond awaiting

24   sentencing just a few months later in this very building, he and

25   three of his prostitutes appeared as themselves on the Jerry

1  Springer show.  This Court has a seven minute clip of that show

2  in which Avery, on national T.V., brags about his pimping

3  lifestyle, proudly shows off his jewelry, and declares that as a

4  result of his prostitutes' work, he is a, quote, rich man.

5  Again, the F.B.I. did not encourage this, and I've seen nothing

6  that tells me they were aware he was doing this.

7         Finally, and almost unbelievably, he's profiled in a

8  BBC documentary called True Stories, Pimp Snooky, filmed in 1999

9  here in Milwaukee, also while he was on bond in the Federal

10  case, and then broadcast on H.B.O. in England and I believe

11  throughout Europe in the year 2000.  The defense and prosecution

12  teams have seen this documentary, and the Court has two reviews

13  of it.  Again, Derrick Avery, Pimp Snooky, is a sex trafficker

14  of national significance and international reputation.  He is a

15  pimp's pimp.

16         I also want to put just a bit of a personal touch into

17  my comments and talk about my interactions with some of the

18  women who were victimized in this case.  Women that Derrick

19  Avery turned into prostitutes.  Females that he seduced,

20  manipulated, recruited, programmed, trained, disciplined, and

21  physically abused in his life destroying pursuit of the money

22  that he could get through their sexual services.

23         Mr. Cotton talked about Shamika Evans and said we have

24  a gross disparity here between Shamika Evans and Derrick Avery.

25  All of us on the prosecution team, the Agents, prosecutors,

1  everybody involved, considers Shamika Evans to be Derrick

2  Avery's biggest victim of all.  She was 18 years old when he

3  brought her into his stable.  Gave her three children.  And she

4  stayed with him through his arrest, and her arrest, at the end

5  of July of 2009 on our Federal criminal complaint here.

6      She debriefed extensively.  Many, many, many days.

7  And I sat through a number of those.  And on numerous

8  occasions -- her memory is so sharp -- she would talk about

9  beatings.  Where they occurred, what Mr. Avery used to beat her,

10  who was there.  And then she would show us, on whatever part of

11  her body it was, or various parts of her body, the scars she had

12  from each particular beating.  She would point to a scar on her

13  face and say this is when he hit me with a lamp.  She would

14  point to another scar on her face, and she would say this is

15  when he beat me with a broomstick.  She would point to another

16  scar, maybe on her leg, and say this is when he stomped me with

17  his alligator shoes.  And she would go on and on.  A memory I

18  guess because this is seared in her memory.  Just an incredible

19  memory.  Details of the beatings.  And she stuck with him.  And

20  only because of him was she involved in the criminal conduct for

21  which she has pled guilty.

22      Because of Mr. Avery she's now a convicted sex

23  trafficker.  She must register for the rest of her life.

24  Because of Mr. Avery, she faces a termination of parental rights

25  proceeding out of Las Vegas, Nevada.  Clark County.  It appears

almost certain that because of Mr. Avery she will lose her

parental rights to three of her children.  A disposition that I

have often been quoted as calling the civil death penalty.

The victim described in Count 3 of this Indictment is

prostituted Child "B".  She was 17 years old when Avery spotted

her in Milwaukee's downtown Greyhound station.  I can tell the

Court that just by looking at her, Derrick Avery knew that she

was an easy mark.  She looked lost and alone, which she was.

Avery charmed her, befriended her, and through his incredible

skills at psychological manipulation, he questioned her in a

caring, nonjudgmental way, thereby learning her innermost

feelings, secrets, fears, and pain.  He showed an interest in

this 17-year old runaway that appeared to her to be genuine,

loving, and caring.

He took her shopping that evening.  Bought her

clothes, personal items, hygiene products.  Convincing her,

during all of this, that it would be best for her -- because

maybe she's not too responsible -- for safekeeping he took from

her her Wisconsin identification card; her Social Security card;

her personal address book containing all the information of her

friends and family; her purse, which contained the other

remnants of her life.  Then he took her home, introduced her to

the other women at the house -- all of whom were his

prostitutes -- and then he had sex with her.

Contrary to what Mr. Cotton stated, prostituted Child

1  "B" had never prostituted before.  She had never engaged in

2  prostitution.  But within a week, under Mr. Avery's sway, she

3  was traveling to Chicago every single night to work as a

4  prostitute for Mr. Avery.

5        The Defendant's physical abuse of this child, her

6  escape from his home, and her flight from Milwaukee for her own

7  safety, and then safety of her family, is detailed in the

8  Government's sentencing memorandum.  And I don't need to repeat

9  it all here.  But the details are, to quote Mr. Cotton,

10  horrific.

11        There is another woman I want to briefly talk about.

12  She's identified as prostituted female number 10.  Agents and I

13  met her in Milwaukee in November of 2009.  And after she had

14  been served with a Grand Jury subpoena in Las Vegas, while she

15  was sitting in jail on a prostitution arrest, she flew to

16  Milwaukee for her testimony.  She appeared in our office on

17  November 2nd of '09, wearing a business suit, with her luggage

18  on a hand cart.  She looked like an executive.  Very soon after

19  the Agents and I began to interview her and prepare her for the

20  Grand Jury, I realized, as we all did, that she was extremely

21  smart.  She also had a very endearing, and delightful,

22  self-deprecating sense of humor.  Again, showing her

23  intelligence.

24        She said that she met Avery in October of 2007.

25  She was working in a strip club in Minneapolis.  She was a

1    dancer.  She was 20 years old.  She related that Mr. Avery and

2    his entourage of men and women arrived at the club driving new

3    and very expensive B.M.W. and Mercedes Benz automobiles.  She

4    was immediately impressed by all of this.

5         His seduction of her then began.  He and the others,

6    including his veteran prostitutes that were with him,

7    immediately targeted her.  And she is, quite frankly, beautiful.

8    After getting to know her, Avery and his group began bragging to

9    her about their Las Vegas lifestyle.  The glamour, and the

10   glitz, and all the money that they had access to.  The women in

11   the entourage told her that they had everything that they

12   wanted, and she could have it, too.

13        She went back with them to the house that they were

14   staying at and spent the night.  She told me I was infatuated.

15   And their seduction continued.  One of the other women told her

16   that if she came to Las Vegas with them, quote, you can have

17   more money than you could ever imagine.  And the power to do

18   whatever you want, whenever you want.  Unquote.  All, of course,

19   a lie.

20        Eventually Avery took her aside, and he talked to her.

21   By the time she flew to Las Vegas with the group, she knew that

22   she'd be prostituting with the other women for Derrick Avery.

23   Again, contrary to what Mr. Cotton said, this woman had never

24   engaged in prostitution until she met Derrick Avery.

25        Again, because I was so impressed with her, and was

1  thinking of the other -- I guess to me -- better and more
2  healthy career opportunities that this young lady should have
3  had available to her, and to someone of her intelligence,
4  strength, poise, and charm, I asked her a bit about her
5  background and her childhood.  During the course of our
6  conversation, she told me that she had run away from home at the
7  age of 15.  About five years earlier.  I guess foolishly I asked
8  her why she had done that.  And she started to sob.  And she
9  broke down.  She said my stepfather began having sex with me
10 when I was 9 years old, I couldn't take it anymore.

11      These are his victims.  Mr. Cotton says that this is
12 not the most horrific sex trafficking case, but it is in this
13 building.  Of the 7 individuals we've convicted under this
14 Statute, individuals we have prosecuted, investigated, indicted,
15 and convicted here in this building, Mr. Avery's conduct is by
16 far the most horrific, the most brutal, the most inhumane.

17      The Government's recommendations.  Under the
18 guidelines, for the reasons detailed in the sentencing
19 memorandum -- and if a formal 5K1 is needed here, consider it
20 being made right now -- but I ask that the Court in handing down
21 a sentence for Mr. Avery do two things.  First, is to send a
22 message of general deterrence to other men who are involved in
23 or contemplating becoming involved in this dirty, sickening
24 business.  To show them that a long sentence awaits them sooner
25 or later at the end of the road.

1          The second thing that I ask the Court to do in its

2  sentencing is to be the voice of every child and adult who's

3  been prostituted by Avery and other men like him.  Be the one,

4  Judge, to voice their suffering.  Their physical, emotional,

5  psychological, and mental pain and agony.  Their debasement and

6  degradation.  Give voice to their embarrassment and humiliation.

7  Their unending nightmares, both while awake and during their

8  disturbed sleep.  Give life in your sentence to the lives

9  destroyed by this man and others like him.  Be the voice of

10  these women.  Make your sentence reflect their voice.

11          That sentence should be 20 years imprisonment on

12  Count 3, and a concurrent term of imprisonment of 5 years on

13  Count 1.  No fine.  Five years supervised release.  Thank you,

14  Your Honor.

15          THE COURT:  Okay.

16          MR. COTTON:  Just a brief rebuttal, Judge.  First of

17  all, with respect to the F.B.I.'s work with Mr. Avery and their

18  knowledge of what he was doing, I'll quote from the unsealed

19  report.  And this is when the F.B.I. was asking for -- the

20  F.B.I. had a $20,000 budget to help Mr. Avery promote the Snooky

21  imagine in 1998 and '99.  At one point they had asked for $500,

22  noting that Mr. Avery's credibility and ability to gain the

23  trust of other individuals that they wanted to prosecute

24  depended largely on his ability to maintain his image as a

25  successful, rich pimp.  The F.B.I. knew that Mr. Avery was

1  portraying the image of a successful, rich pimp, and had a
2  $20,000 budget to assist him with that.

3        Mr. Wall spoke of a couple of women.  We heard from
4  one grandmother here.  And that's the only in-person testimony
5  we have to the impact that's occurred.  And mention one other,
6  and that's Janelle Lewis, who took -- was so enamored with the
7  Snooky lifestyle, that she took a bus from Washington D.C. with
8  $5,000 in her pocket, showed up in Milwaukee with the tattoo on
9  her arm of Snooky, and searched around until she found Mr.
10 Avery.

11        We would ask the Court to impose a sentence along the
12 lines proposed in our memorandum.  We think it's a significant
13 punishment for any person to endure.

14        THE COURT:  Okay.  Thank you.  I'll be back
15 momentarily.

16        (Whereupon a recess was called by the Court.  Upon
17 conclusion of the recess, the proceedings continued as follows:)

18        THE COURT:  Okay.  In imposing sentence I consider the
19 3553(a) factors.  And then after considering them I impose a
20 sentence that's sufficient but not greater than necessary to
21 comply with the purposes of sentencing.  Which are just
22 punishment, deterrence, protection of the public, and
23 rehabilitation of the Defendant.

24        Starting with the nature of the offense, from January,
25 2001, to July 31st, 2009 -- and I know just -- that that period

1   is -- some of the events that the counsel have talked about with
2   respect to media appearances, and whether or not he was working
3   with the F.B.I., really that's all before the charged period.
4   So to some extent -- I mean, I guess I'm allowed to consider
5   that, but I don't really see that as particularly significant
6   for purposes of the sentence, which covers this charged period
7   of July -- or the conduct involved begins in January, 2001, and
8   goes to July of 2009. And offense is that the Defendant engaged
9   in sex trafficking, including trafficking of minors. And he
10  conspired with others, including some of his prostitutes to
11  recruit and transport minor and adult females, knowing that
12  force, fraud, and coercion would be used to cause these females
13  to engage in commercial sex acts. And the monies then derived
14  from these acts would be given to the Defendant or to others for
15  the Defendant's benefit.

16          The Defendant directed his prostitutes that were most
17  trusted to train new prostitutes in the business so that they
18  understood the rules. And this training was also known by the
19  people who were involved in it as programming. And included --
20  included a number of rules. Among others, the women always had
21  to walk behind the Defendant with their heads bowed -- or not
22  always, but when they were in the presence of other men. The
23  women could never talk to another man involved in the
24  prostitution business. They couldn't look another man in the
25  eye unless it was a man for whom the prostituted female was to

1   provide sexual services for money.  They were never to talk back

2   to the Defendant, or talk disrespectfully to him while in the

3   presence of others, including his other prostituted females.

4   They weren't to have any boyfriends except for the Defendant.

5   They were always to use a condom during a prostitution date.

6   They weren't to take off their clothes until the date was naked.

7   They were never to use alcohol or drugs before a night of

8   prostituting.  They were always to give the Defendant, and never

9   keep for themselves, any of their earnings from prostitution or

10  from prostitution related theft.  And they were always to call

11  the Defendant Daddy.

12          The Defendant also physically assaulted these

13  prostituted females for various purposes, including to make them

14  work harder, to punish them for violating the rules of

15  prostitution, to instill discipline in them and the other

16  prostitutes who observed the assaults, to prevent them from

17  leaving his sex trafficking business.  And to create a constant

18  atmosphere of fear, such that they always did exactly what he

19  told them to do.  As discussed in the presentence, and as

20  Defendant admitted in the Plea Agreement, he physically

21  assaulted the females in a number of ways, including beating

22  them with fists, with wooden and metal brooms, pool cues, pans,

23  chairs, and leather belts.  Slapping them in the face

24  methodically, back and forth, using his open hands.  Stomping

25  and kicking them with his alligator shoes.  Placing a phonebook

1    on their backs and striking it with a baseball bat.  Subjecting

2    them to the hot treatment.  That is pouring rubbing alcohol on

3    their bodies and lighting it.  And subjecting them to the cold

4    treatment.  That is holding them down in a bathtub filled with

5    ice cubes for a certain period of time.

6           The Defendant also sought to learn personal

7    information about them and their families, so as to threaten and

8    instill fear in them, should they try to leave to tell law

9    enforcement about what was going on.  The Defendant pressured

10   the prostituted females to earn a certain amount of money or a

11   quota each night, or each week.  He instructed the females to

12   wire the proceeds of their prostitution activities to Milwaukee

13   through Western Union.  He prevented the females from obtaining

14   medical care for their injuries after he assaulted them.  He

15   also instructed them to steal belongings from their dates, such

16   as cash, jewelry, credit cards, and other valuables.  He further

17   instructed his prostituted females to never mention his name if

18   they were arrested.  And he threatened to kill them or their

19   families if they did.

20          The Defendant also impregnated many of the females.

21   He indicates that the sex was consensual, and he disputes that

22   he had children with them to gain more control over them.

23   Nevertheless, several of the women with whom he had children

24   indicated in sworn statements that the Defendant, like other

25   pimps, had children with his prostitutes so as to give them

1   more -- give him more control over them.

2        The Defendant transported or caused to be transported

3   various of his prostitutes to other locations throughout the

4   country to earn money for him.

5        Regarding the use of minors, Jacqueline "M" began

6   prostituting when she was 14.  She met the Defendant in 2002 in

7   Milwaukee.  And then was prostituting within a few weeks.  First

8   in Chicago, then in Las Vegas.  Eventually she left the

9   Defendant and prostituted for another pimp for about a year

10  before returning to the Defendant, who had relocated to Las

11  Vegas.  In Las Vegas she earned up to $3,000 a night, and on

12  some occasions brought $10,000 or more back to the Defendant.

13  At the Defendant's direction she sent prostitution money through

14  Western Union to individuals that he identified.

15       Like the others, the Defendant was abusive and

16  threatening with her, and she saw him physically assault other

17  of his prostitutes.  The Defendant struck her at times in the

18  beginning of her relationship with him.  She stopped

19  prostituting for the Defendant just before his birthday in

20  November, 2007.  I note that the Defendant does not object to

21  the information about Jacqueline "M" set forth in paragraphs 46

22  through 48 of the presentence report.  Rather, he states that he

23  wants the Court to be aware that when she left him, it was her

24  personal decision.  That she is still prostituting, and that she

25  was the first person to put money in his jail account.

1    Sierra "G" stated that she met the Defendant in

2  Milwaukee at the Amtrak station when she was 14.  And she and

3  Shamika Evans talked to her about working for the Defendant as a

4  prostitute.  At that time Sierra was working as a prostitute for

5  a different pimp, and traveling to Chicago to work.  She went

6  with the Defendant and Shamika to a house on 29th Street in

7  Milwaukee, where she met Jacqueline "M".  There Shamika told her

8  the Defendant's rules.  Sierra stated that she told the

9  Defendant that she was 14, although he denies that.  She

10  traveled to Chicago nearly every day to prostitute for the

11  Defendant, usually with Jacqueline and Shamika.  Eventually they

12  relocated to Las Vegas.  She indicates that prior to her 18th

13  birthday she also traveled to other cities to prostitute for the

14  Defendant, including Miami, New Orleans, and St. Paul.  The

15  Defendant denies that.

16    She also stated that the Defendant beat her on

17  numerous occasions for not following the rules; being

18  disrespectful to him; or not making enough money.

19    In 2006 she was arrested for prostitution in Las

20  Vegas, and she gave a statement to law enforcement about her

21  work as a prostitute for the Defendant.  In spring, 2009, the

22  Defendant obtained the Police reports with her statements about

23  him, and in response he beat, punched, and choked her, and then

24  tied her up and locked her in a closet.  He also threatened to

25  kill her oldest child.  She eventually fled from him.  Sierra

expert

1  "G" has one child with the Defendant.

2         In his objections to the presentence, the Defendant

3  offers a one sentence objection to Paragraph 54 which sets forth

4  that this abuse after her arrest -- he says, quote, Mr. Avery

5  denies he was violent with Sierra, quote.  And Donald

6  "B" confirmed that the Defendant beat Sierra in his statement

7  which is set forth in Paragraph 90 of the presentence.

8         Finally, in June and July of 2004, the Defendant

9  encountered Mary "S", who was then 17, and a chronic runaway,

10 and convinced her to become a prostitute for him.  From that

11 point until August 8th of 2004 she traveled to Chicago nearly

12 every night to prostitute.  In early August, 2004, the Defendant

13 decided to move his stable of women to Las Vegas.  Mary

14 objected, because she didn't want to be so far from her family.

15 In an effort to force her to go, the Defendant beat her first

16 with his hands and his belt, then with his shoe, and then with a

17 wooden broomstick.  He beat her over the head, and everywhere on

18 her body, eventually breaking the broomstick.  After breaking

19 the wooden broomstick, he grabbed an aluminum broomstick and

20 continued beating her eventually, bending it.  During the course

21 of the beating the Defendant took a break and called a friend.

22 He told the person on the other line he would pay for that

23 person to kill Mary's father.  Quote, I'll give you $2,800 to

24 put a bullet in this girl's Daddy's head, quote.  Eventually the

25 Defendant fell asleep.  Although she had no shoes, Mary exited

1 the house, leaving her purse and her belongings in the house.

2 She found a gas station nearby, and asked a man pumping gas for

3 help.  He took her to her mother's house.  Her mother then

4 called the Police, who came to the house, took pictures of her,

5 and interviewed her.  While the Police were there, the Defendant

6 called the house and her mother answered the phone.  A bit later

7 her father called the house and said that the Defendant had

8 called him complaining Mary had gone to the Police, and that she

9 should call the dogs off because she was opening doors that

10 couldn't be opened -- or I'm sorry, opening doors that shouldn't

11 be opened.  That's a quote.

12      After that she stopped cooperating with the Police,

13 and would not go to the station with them.  She was worried

14 about her father's safety, as he was disabled, and the Defendant

15 knew that.  Mary left Milwaukee and did not return for almost a

16 year.

17      The presentence report sets forth more statements from

18 the women, but the statements I've read, or the incidents that

19 I've already talked about, sort of gives a sense of the violent,

20 abusive, and degrading manner in which the Defendant treated

21 these women.  And the tactics that he used to keep them in line.

22      Sierra "G" submitted a victim impact statement to the

23 U.S. Attorney's Office, which is set forth in Paragraph 96.  She

24 says that she's fearful on a daily basis.  Doesn't trust anyone.

25 She's trying to do the right thing by going to school and

1  supporting her two children.  She met the Defendant when she was

2  14, and has never really attended school.  She has trouble

3  getting jobs because of her background.  She doesn't receive

4  help from her family.  She and her children have been homeless

5  at times, and her family only wants her money.  She hopes the

6  Defendant's punishment will fit his crime.  She feels that her

7  life has been ruined forever.  She wishes she could forget about

8  all that happened to her with the Defendant.

9       In response to Paragraph 96, the Defendant states that

10  Sierra was prostituting at age 11 before she met him.  He says

11  she's had more prostitution arrests since she left him, and that

12  even during the time she worked for him, she also worked for

13  other pimps.  But, you know, I'm not sure how this actually

14  lessens the trauma of what happened to her with the Defendant.

15       In his statement to the presentence writer, the

16  Defendant acknowledged the facts of this case.  Acknowledges

17  that the facts are substantially true, and he admits his guilt

18  and involvement.  He indicates that he's cooperated with the

19  Government, and explained his involvement.  He says his

20  involvement in this offense came about gradually.  He became

21  widely known as Pimp Snooky, and became addicted to the

22  attention he received.  He says that several years ago the

23  F.B.I. asked for his assistance in other cases, and he felt that

24  he had a certain authority and credibility.  He was encouraged

25  to maintain his image as a successful and wealthy pimp, but he

1  never expected Pimp Snooky to become such a celebrity.  He

2  states that he sincerely wants to help others in his life at

3  this point, and no longer wants to be involved in prostitution

4  or pimping.  And wants to speak and lecture about this and tell

5  people how harmful the business is.

6           He believes the true victims in this case are his

7  children, who are being raised by single mothers and without the

8  support of a father.  He also says he wishes to apologize to the

9  women involved in the case.  He's proud of the fact that he took

10  responsibility for his actions, and he's proud of himself.  Even

11  though he's incarcerated, he believes his life has turned around

12  for the better.  He says he's ready to help the Government close

13  other prostitution rings, and is looking forward to his release

14  so he can support his family and raise the public's awareness

15  about issues of prostitution and pimping.

16           Turning to the Defendant's character, he's 45.  He has

17  a substantial prior record.  Robbery in 1986; felon in

18  possession in 1989; assault and battery in 1991; felon in

19  possession in 1993; disorderly conduct while armed and battery

20  in 1994; failure to support a child in 1996; felon in possession

21  in 1999; and then a drug possession in 2008.  There's a 10 year

22  gap between the last two convictions, but it was during this

23  time that the Defendant committed the instant offense.  So

24  there's really not a break in the criminal conduct.

25           The PSR includes statements from family members, which

1    I've considered.  His mother says he's not the monster he's

2    been made out to be.  His sister indicates that he cares for his

3    children.

4            I'll also consider the statements of the people today,

5    both Defendant's people, family members, and supporters of the

6    Defendant, and also Miss Myers, who spoke really on the

7    Government's side.

8            The Defendant told the presentence writer that he has

9    26 children, but he's only provided information on 20 of them.

10   His support arrears were about $30,000, but he settled in 2005

11   for 12,000.  And the Defendant admits some past substance abuse,

12   but he doesn't appear to have a significant current problem.

13   He's a high school grad, and he reports self employment in

14   various business ventures.

15           The guidelines call for a term of 360 months to life.

16   The Government recommends 240 months.  The Defendant recommends

17   120 months.  I agree with both the Government and the Defendant

18   that a term below the range is sufficient to satisfy the

19   purposes of sentencing.  The Government didn't address it a lot

20   in their oral statement, but in the memorandum submitted the

21   Defendant apparently has made significant attempts to cooperate.

22   And that his efforts to cooperate with the Government and

23   provide information certainly does warrant consideration, with

24   or without a formal 5K motion.  See United States vs. Knox, 573

25   F.3d 441 at 453, Seventh Circuit, 2009.  And the cooperation was

1   extensive in provision of information. And it's discussed in

2   detail in the submissions, and I will consider it in imposing

3   sentence. I don't know if there's any possible Rule 35 motion

4   in the offing. That's pretty much in the control of the

5   Government.

6           I do find that the suggested sentence by the Defendant

7   is not really adequate. I think that there's -- the Defendant

8   depreciates the seriousness of his crime by noting that he

9   didn't force some of the prostitutes into the field. Some were

10   prostitutes before he found them. Others maybe even sought him

11   out. But what makes this case so aggravated, or one aspect of

12   it that makes it aggravated, is that -- the lengthy period of

13   time over which the Defendant engaged in this activity, and then

14   the violent and degrading manner in which he treated the women

15   who worked for him. Defendant notes that some continued to

16   prostitute themselves even after he went to jail. But I don't

17   really think that that mitigates things. You know, it's true

18   that the Defendant didn't create the prostitution racket, and

19   maybe there were -- some of the women that worked for him were

20   prostitutes before, but he engaged in it in a brutal fashion for

21   nearly 10 years.

22           The Defendant notes that a long sentence means that

23   his children will grow up without a father. I understand and I

24   appreciate the statement of his daughter which, in many ways,

25   was a very impressive statement. There's no doubt that she's

1    very intelligent.  And I appreciate the other family member

2    statements.  But I don't think there's any evidence in the

3    record, or not very much, that the Defendant was a very involved

4    father to the children.  It's not clear whether it was 20, or --

5    20, or 21, or 26 children that he has.  There's really very

6    little indication that he was an involved father with these

7    children.  And even under his recommendation he's going to be

8    away from them for a long time.

9         The Defendant also contends that his criminal history

10   is overstated, but I don't agree with that assertion.  As I

11   noted in discussing his record, he's really been involved

12   continually in criminality for more than 25 years.  Now, most of

13   his priors are older, and they occurred when he was a younger

14   man.  But that argument would have a lot more force if he had

15   stayed out of trouble since then.  But there's no sustained

16   period of time since 1985 when he wasn't either involved in the

17   system, or involved in the conduct that I'm sentencing him for

18   now.  Which covers, as I say, from 2001 to 2009.

19        Departures under 4A1.3(b) or variances based on this

20   overstatement argument make -- they seem more appropriate when

21   the priors are old and there's no other evidence of criminal

22   behavior in the intervening period, as discussed in application

23   note 3.  So I don't really think there's a basis for departing

24   or lowering the sentence based on this argument.

25        The Defendant asked me to disregard the 1990 municipal

1   battery case, but even if I do that, he's still in Category 6.

2   He also asked me to reject the 1993 felon in possession case,

3   arguing that that case is old, and that he no longer associates

4   with guns.  But the Defendant has three felon in possession

5   cases on his record, and I really can't ignore that.  The

6   instant offense conduct may not have involved guns, but it

7   certainly involved a lot of violence.  I see no indication that

8   the scoring of the 1993 case grossly overstates his record, as

9   the Defendant argues.

10      The Defendant also asked me not to consider the 1993

11  disorderly conduct and battery case, arguing that this case

12  shows the mistakes of a young man growing up in a violent

13  neighborhood under difficult conditions.  But he continued this

14  violent behavior in the case into his forties.  Once again, I

15  don't accept the overstatement argument.  Category 6 is really

16  an appropriate criminal history category based on all the

17  evidence.  Nevertheless, I note that even in Category 5 -- even

18  if he was in Category 5, and using his recommended offense

19  level, his guideline range would be 262 to 327 months.  And even

20  if he was in Category 4, it would be 235 months to 293 months.

21  And only if it was that low would it go below the guideline

22  recommendation that the -- not the guideline recommendation, I

23  guess the sentencing recommendation that the Government is

24  making.  And it wouldn't even be anywhere near the

25  recommendation that the Defendant makes.  Even if I -- even if

1    I -- as I say, lowered these categories to 5 or 4.

2              The seriousness of the instant offense, and the prior

3    record really demand a prison term of substantially more than

4    the Defendant requests.  A more substantial sentence is also

5    needed for purposes of general deterrence, to make clear that

6    this sort of conduct won't be tolerated.

7              On the cooperation issue, the Defendant argues that

8    the cooperation is not what entitled him to the 20 year

9    recommendation, which was offered before he debriefed.  The

10   Government disagrees and indicates that the debriefing was

11   required for the 20 year recommendation.  But I don't really

12   have to resolve that.  I ultimately decide what the cooperation

13   is worth.  And I'm not bound by the parties' recommendations.

14             The Defendant argues that a 20 year sentence would

15   create unwarranted disparity.  He first compares himself to

16   co-Defendant Shamika Evans, but she hasn't been sentenced yet,

17   and I don't know what will happen in her case.  So that's not

18   really a helpful comparison.  And then he gives a list of other

19   Defendants sentenced for other conduct across the country.  I

20   guess the conduct is somewhat similar.  And most of the other

21   Defendants got less than the Government's recommendation.  But

22   there's really not enough information that is provided to me

23   about the specifics of those cases, and what those -- what

24   exactly the Defendants did, and what their criminal records

25   were.  So it's really not -- it doesn't really help me to make a

1   very good comparison.  I mean, I can certainly -- can and will

2   consider these types of arguments.

3           The Seventh Circuit has noted that the best way to

4   curtail, quote, unwarranted, quote, disparity is to follow the

5   guidelines.  See U.S. vs. Bartlett, 567 F.3d 901 at 908, Seventh

6   Circuit, 2009.  The Defendant lists some Wisconsin cases

7   involving sentences of 30 years, 25 years, 5 years, and

8   168 months.  And those cases also don't support the Defendant's

9   requested sentence.

10          Defendant also argues that 10 years is enough for

11  specific deterrence.  But I don't really agree with that,

12  either.  The Defendant's been to prison before.  Not for long.

13  Long periods.  I agree.  But the periods he was in, he got out.

14  He quickly returned to crime.  And he apparently got a break in

15  his last Federal prosecution.

16          Also I really have to consider the need for just

17  punishment.  And just punishment -- that need here demands a

18  severe sentence.  And general deterrence does also.  And

19  protection of the public does, also.  Although it's true that

20  Defendants sometimes age out of criminality, and it's possible

21  that the Defendant will, I don't -- there's really no evidence

22  one way or another on that.  It's possible that he could return

23  to this kind of conduct.  It's possible that he wouldn't.  And

24  it's hard to really base much on that, because it's all

25  speculative.

1          I agree generally that Courts should employ

2     incremental punishments in order to deter.  And someone who's

3     not been previously subject to a long imprisonment may require

4     less time for specific deterrence to be deterred, than someone

5     who has already done really a long time but continues to

6     re-offend.  See U.S. vs. Qualls, 373 F.Supp.2d at 877.

7     Defendant's past sentences have been on the lenient side, but

8     he's been to prison several times and it didn't help.

9          Finally, a Court should take seriously the notion that

10    its sentence will require the Defendant to spend the rest of his

11    life in prison.  And that's another argument that the Defendant

12    makes.  And I think that's a serious argument.  See U.S. vs.

13    Vallar, 635 F.3d, 271 at 279-80, Seventh Circuit, 2011.

14         Defendant's now 45, and he indicates that his

15    predicted life expectancy is 61.  And he relies on a report

16    which indicates that a black male born in 1966 has an estimated

17    life expectancy of 60.9 years.  But it's certainly possible that

18    the Defendant could live longer than that.  I mean, life

19    expectancy changes as a person grows older.  Because the formula

20    leaves out the people who died at ages younger than his current

21    age.  For example, if we're trying to determine life expectancy

22    at a time when the person is 50, we don't average in the numbers

23    for people who died before reaching age 50.  The chart Defendant

24    uses appears to measure life expectancy at birth.  But there's

25    no -- I'm not going to get into an actuarial dispute here.  I

1  find that the purposes of sentencing require a term longer than

2  that proposed by the defense.

3        Under all the circumstances I find a sentence of

4  240 months sufficient but not greater than necessary to satisfy

5  the purposes of sentencing.  This Defendant -- this sentence is

6  based on 3553(a), and it would be the same even if I had agreed

7  with the Defendant on all the guideline objections.  See U.S.

8  vs. Sanner, 565 F.3d 400 at 406, Seventh Circuit, 2009.  Even

9  under his version, the guideline range would be 292 months to

10  365 months, which is well above the sentence I've imposed.

11        Therefore, Defendant is committed to the Bureau of

12  Prisons for 60 months on Count 1, and 240 months on Count 3, to

13  run concurrent.  I recommend that he be placed at Oxford.  I

14  make this recommendation based on the reasons set forth in the

15  Defendant's PSR addendum.  Based on his financial situation, I'm

16  not going to impose any fine.  Three years of supervised release

17  on each Count to assure monitoring.  While on supervised release

18  Defendant cannot commit any crimes.  He has to comply with the

19  standard conditions of the Court.  Within 72 hours of release he

20  has to report to probation.  No firearms, or dangerous weapons,

21  or possession of a controlled substance.  He has to cooperate

22  with DNA.  Has to participate in a program of testing and

23  residential or outpatient treatment for drug or alcohol abuse as

24  directed by probation.  Probation can require up to six random

25  tests per month.  Special assessment is $200 due immediately in

1   Room 362.

2           Defendant has a right to appeal if he thinks there's

3   something unlawful about the conviction or the sentence.

4   Counsel has a duty to advise him of his rights in that regard.

5   Any Notice of Appeal has to be filed within 14 days of the entry

6   of judgment.  If Defendant wants to appeal, and can't afford to,

7   he can ask for leave to appeal as a poor person.

8           I'll dismiss all the other counts.  I think that's

9   everything.  Thank you.

10          MR. WASHINGTON:  Judge, one other matter, please.

11  There have been some submissions by the defense in this case,

12  including some documents that bear the images of children.  Some

13  documents that bear the images of children, which I think it is

14  generally the practice of this District not to include the

15  images of children without them being redacted.  And I would

16  respectfully ask that we -- the parties take it upon themselves

17  to submit to the Court modified submissions that do not include

18  the images of children, Judge.

19          THE COURT:  Any objection, Mr. Cotton?

20          MR. COTTON:  I don't have any problem with that.

21          THE COURT:  Okay.  So ordered.

22                      *      *      *

23

24

25

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WISCONSIN

3

4            I, HEIDI J. TRAPP, Official Court Reporter for the

5    United States District Court, Eastern District of Wisconsin, do

6    hereby certify that I reported the foregoing Transcript of

7    Proceedings; that the same is true and correct as reflected by

8    my original machine shorthand notes taken at said time and place

9    before the Hon. Lynn Adelman.

10

11                        _____

                          Official Court Reporter
12                        United States District Court

13

14   Dated at Milwaukee, Wisconsin,

15   this 11th day of June, 2012.

16

17

18

19

20

21

22

23

24

25